# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 4:25-cr-00510** |
| | § | |
| **HAO GLOBAL LLC** | § | |
| | § | **FILED UNDER SEAL** |
| | § | |

## PLEA AGREEMENT

The United States of America, by and through Nicholas J. Ganjei, United States Attorney for the Southern District of Texas, John Marck and S. Mark McIntyre, Assistant United States Attorneys, National Security Division, Counterintelligence and Export Control Section Trial Attorneys Yifei Zheng and Fatema Merchant, the defendant, **HAO GLOBAL LLC** ("Defendant"), and Defendant's counsel, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1. Defendant agrees to plead guilty to Counts One and Two of the Information. Count One charges Defendant with Smuggling, in violation of Title 18, United States Code, Sections 554(a) and 2. Count Two charges Defendant with Unlawful Export Activities, in violation of Title 13, United States Code, Section 305, and Title 18, United States Code, Section 2. Defendant, by entering this plea, agrees that it is waiving any right to have the facts that the law makes essential to the punishment either charged in the Information, or proved to a jury or proven beyond a reasonable doubt.

## Punishment Range

2.    The **statutory** maximum penalty for violating Count One: Title 18, United States Code, Sections 554(a) and 2, is a term of probation of not less than 1 year and not more than five years and a fine of not more than $250,000 or twice the gross gain or loss from the offense. The **statutory** maximum penalty for violating Count Two: Title 13, United States Code, Section 305, and Title 18, United States Code, Section 2, is a term of probation of not less than 1 year and not more than five years and a fine not to exceed $10,000 per violation, or both.

## Mandatory Special Assessment

3.    Pursuant to Title 18, United States Code, Section 3013(a)(2)(B), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of four hundred dollars ($400.00) per count of conviction. The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

## Waiver of Appeal, Collateral Review, and Statute of Limitations

4.    Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, Section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, Section 2255. In the event

2

Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks its conviction or sentence, the United States will assert its rights under this agreement and seek specific performance of these waivers.

5. Defendant also agrees that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

6. In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that it may have received from its counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce its guilty plea, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

7. Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States' Agreements

8. The United States Attorney's Office for the Southern District of Texas and the Counterintelligence and Export Control Section of National Security Division of the Department of Justice agree that they will not further criminally prosecute Defendant for the specific conduct described in the Information. This plea agreement binds only the United States Attorney's Office for the Southern District of Texas, the Counterintelligence and Export Control Section of National Security Division of the Justice Department, and Defendant. It does not bind any other United States Attorney's Office. The United States Attorney's Office for the Southern District of Texas and the Counterintelligence and Export Control Section of the National Security Division will bring this plea agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

## United States' Non-Waiver of Appeal

9. The United States reserves the right to carry out its responsibilities under guidelines sentencing. Specifically, the United States reserves the right:

(a)     to bring the facts of this case, including evidence in the files of the United States Attorney's Office for the Southern District of Texas or the files of any investigative agency, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)     to set forth or dispute sentencing factors or facts material to sentencing;

(c)     to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)     to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, Section 3553(a); and

(e)     to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

10. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offenses to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

## Rights at Trial

11.   Defendant understands that by entering into this agreement, it surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a)     If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the court all agree.

5

(b)    At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and its attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on its own behalf. If the witnesses for Defendant would not appear voluntarily, it could require their attendance through the subpoena power of the court; and

(c)    At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if Defendant desired to do so, it could testify on its own behalf.

### Factual Basis for Guilty Plea

12.    Defendant is pleading guilty because it is in fact guilty of the charges contained in Count 1 of the Information. Defendant admits and agrees that, if this case were to proceed to trial, the United States could prove each element of the offenses beyond a reasonable doubt, including the following facts, which among others would be offered to establish Defendant's guilt:

### THE GPU SMUGGLING SCHEME

Since at least October 2024 and continuing through, in or about, May 2025, **ALAN HAO HSU**, a/k/a/ **HAOCHUN HSU**, and other individuals, utilizing **HSU**'s company, defendant **HAO GLOBAL LLC**, knowingly smuggled, attempted to smuggle, exported, or transferred in country at least $160 million worth of export-controlled Nvidia H100 and H200 Tensor Core Graphic Processing Units ("GPUs"), which are high-speed GPUs used for artificial intelligence ("AI") applications and high-performance computing ("HPC"), outside of the United States in violation of U.S. Those GPUs were ultimately exported to the People's Republic of China ("PRC"), Hong Kong, and other destinations, in violation of U.S. export laws.  Specifically, Nvidia H100 and H200 Tensor Core GPUs are designed to process massive amounts of data, advancing generative AI and large language models and accelerating scientific computing for HPC workloads.

Through the relevant time of this information, PRC-based individuals would provide a business lead to **HSU** about a potential customer of GPUs. Using shell companies and layers of financial transactions, **HSU** and co-conspirators received funds from the PRC; purchased high-powered GPUs through **HAO GLOBAL** for customers seemingly within the United States, Thailand, and Malaysia; and then facilitated the export of those GPUs out of the United States to countries including Thailand and Taiwan. Ultimately, the GPUs were diverted to China and Hong Kong, including by transshipping through third countries.

As part of the illicit scheme, bills of lading were falsified – misclassifying the GPUs for export to obfuscate the true nature of the goods and falsifying the ultimate consignee to hide the GPUs' ultimate destination. The source of the funds was also obscured – funds from accounts in the PRC would be deposited into bank accounts in Thailand, Singapore, and Malaysia, which were then deposited into bank accounts in the United States for use in purchasing the GPUs.

## INTRODUCTION

Defendant **ALAN HAO HSU**, also known as **HAOCHUN HSU**, was a naturalized U.S. citizen who resided in Fort Bend County, Texas. In November 2014, **HSU** founded defendant **HAO GLOBAL LLC**, a company registered with the Texas State Comptroller and based in Sugar Land, Texas. From then until October 2024, **HAO GLOBAL** was a dormant corporate entity, with no known sales or business activity.

Starting in October 2024, **HSU**, and other individuals, utilizing **HAO GLOBAL**, began purchasing Nvidia HGX GPU baseboards from a Hong Kong-based global technology company with headquarters in Morrisville, North Carolina ("Global Technology Company-1"). Each Nvidia HGX GPU baseboard contained eight Nvidia H100 or H200 Tensor Core GPUs. The

Nvidia H100 Tensor Core GPU was a ninth-generation data center GPU designed to deliver an order-of-magnitude performance leap for large-scale AI and HPC. The Nvidia H200 Tensor Core GPU, building upon the H100, was the world's most advanced chip ever built, designed to power generative AI and HPC applications by processing vast amounts of data at high speed. As further discussed herein, both Nvidia Tensor Core GPUs appeared on the Commerce Control List ("CCL") under Export Control Classification Number ("ECCN") 4A090.a, requiring a license for export to the PRC or Hong Kong. Neither **HSU** nor **HAO GLOBAL** had such a license.

During the relevant period, **HSU** and Global Technology Company-1 agreed to **HAO GLOBAL**'s purchase of 3,872 H100 and 3,160 H200 Tensor Core GPUs, with a total purchase price of $160,815,000. The purchase was divided into multiple transactions and shipments. During that period, **HSU** wire transferred $53,079,000 to Global Technology Company-1 as payment for the export-controlled GPUs. **HAO GLOBAL** received those funds from various other entities, including companies based in Thailand, Singapore, Malaysia, and the PRC.

In exchange for this payment, Global Technology Company-1 agreed to initially ship 480 H100 and 1,552 H200 Tensor Core GPUs.

Although, the "Ship To" address provided to Global Technology Company-1 was a retail-style strip center in Houston, Texas, **HSU** requested the GPUs be collected at a distribution center in Whitsett, North Carolina. The information provided or reviewed by **HSU** on the Shipper's Letters of Instruction and Bills of Lading was incomplete or incorrect, including misclassifying the GPUs as other non-CCL listed electronics merchandise. Shipping records show that GPUs purchased by **HAO GLOBAL** were ultimately exported to the PRC, including by transshipping through Singapore and Malaysia.

## GPU Transaction #1

On October 1, 2024, **HSU** received an email to his **HAO GLOBAL** email address from a business leader with Global Technology Company-1. The business leader inquired about **HSU**'s interest in purchasing Nvidia H100 Tensor Core GPUs directly from Global Technology Company-1. Shortly thereafter, **HSU** and Global Technology Company-1 began negotiations for **HAO GLOBAL** to purchase Nvidia HGX GPU baseboards, each containing eight Nvidia Tensor Core GPUs. During these negotiations, **HSU** provided Global Technology Company-1 with an end user certification stating that the only "Ship-To" country was "USA."

On October 10, 2024, **HSU** forwarded **HAO GLOBAL**'s compliance procedures to Global Technology Company-1, acknowledging and "emphasizing that any products subject to U.S. regulations must remain in the U.S. unless proper export licenses are obtained." On the same day, Global Technology Company-1 forwarded **HSU** an agreed purchase order for 384 Nvidia H100 HGX GPU baseboards, for a total purchase price of $69,120,000. A week later, **HSU** and Global Technology Company-1 agreed to break the purchase into three separate transactions: 60 baseboards for $10.8 million; 150 baseboards for $27 million; and 174 baseboards for $31.32 million.

On or about October 22, 2024, **HSU** agreed to pay an $800,000 non-refundable deposit to be followed by the remaining $10 million. The next day, **HAO GLOBAL** received a wire transfer of $655,000 from AGL Supply Chain, a subsidiary of Rogan Tech Co., a China-based technology company. Later the same day, **HAO GLOBAL** wired $650,000 to Global Technology Company-1. On October 24, 2024, **HSU** wrote a check for $143,000 from AGL Supply Chain and used those funds to open a **HAO GLOBAL** bank account. **HSU** deposited an

additional $10,000 cash into that account. The following day, October 25, 2024, **HSU** wired $150,000 out of **HAO GLOBAL**'s account to Global Technology Company-1.

Between October 26, 2024, and November 21, 2024, **HAO GLOBAL** received transfers totaling $12,600,000 into its account from California Company-1, whose funds originated from Chinese Company-1, a Shenzhen, China-based company that holds patents on artificial intelligence. During that same period, **HSU** made three payments to Global Technology Company-1, totaling $10,000,000. **HSU** then wired $1,470,000 for a "Consulting Fee" to Yu Fan Electronics Co., a Hong Kong-based subsidiary of a Chinese technology company. **HSU** also wired $800,000 back to AGL Supply Chain.

On November 12, 2024, **HSU** traveled from Houston, Texas, to Global Technology Company-1's distribution center in Whitsett, North Carolina, to personally inspect the order of GPUs. After the inspection, on November 18, 2024, **HSU** contacted Global Technology Company-1 and introduced the business development director of International Logistics Company-1, as **HAO GLOBAL**'s contact person for the shipment. Over the next nine days, **HSU** negotiated and arranged for the shipment of the GPUs to be collected from Global Technology Company-1 and shipped to International Logistics Company-1 in New York. On or about November 21, 2024, after **HSU** and the business development director arranged for International Logistics Company-1 to take delivery of the GPUs in North Carolina, **HSU** forwarded a bill of lading which mischaracterized the GPUs as "Computer Servers."

On November 22, 2024, the shipment of GPUs was picked up, and transported to International Logistics Company-1 in New York. The following day, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 60 H100 GPU baseboards at a price

of $180,000 each for a total of $10,800,000. The invoice warned that the GPU baseboards were export-controlled by the U.S. Government and authorized only to the country of ultimate destination herein identified. The "Ship To" address provided to Global Technology Company-1 was a retail-style strip center in Houston, Texas. The "Invoice To" address provided to Global Technology Company-1 was a vacant suite in a corporate office building in Sugar Land, Texas.

On November 25, 2024, the GPUs were shipped from New York to Singapore via an air freight carrier. Two days later, the GPUs were transshipped from Singapore to Hong Kong, PRC, via the same carrier. On or about November 28, 2024, the GPUs arrived in Hong Kong, PRC, without a legally required export license from the U.S. Department of Commerce. Additionally, the Electronic Export Information ("EEI") filing attributed to this order misclassified the items as EAR99, falsely identifying the export control classification of the GPUs.

Records from International Logistics Company-1 show the shipment was insured from initial collection in Whitsett, North Carolina, until final delivery in Hong Kong, PRC, by Chinese Company-1.

### GPU TRANSACTION #2 (PART 1)

While the GPUs from Transaction #1 were still en route to Hong Kong, **HSU** began arranging for the purchase of additional GPUs from Global Technology Company-1. On January 14, 2025, **HSU** emailed Global Technology Company-1 an end-use certification for a second transaction in which **HSU** claimed the end user was Thailand Company-1, a Thailand-based artificial intelligence provider.

On January 15, 2025, **HAO GLOBAL** received a wire transfer of $1,500,000 to its account from Chinese Company-2, a Hong Kong-based internet data center ("IDC") construction service

provider. Around that same time, Chinese Company-2 sent **HSU** an invoice for $1,500,000.
Two days later, Global Technology Company-1 forwarded **HSU** an agreed purchase order for 300
baseboards, which contained 800 H100 GPUs and 1,600 H200 GPUs, with a total purchase price
of $55,620,000. **HSU** and Global Technology Company-1 agreed to break the purchase into three
separate transactions: 30 baseboards; 170 baseboards; and 110 baseboards. Immediately
thereafter, **HSU** paid a deposit of $1,500,000 to Global Technology Company-1. **HSU** and
Global Technology Company-1 further discussed internal shipping and logistics for the order of
GPUs.

On February 12, 2025, **HAO GLOBAL** received a wire transfer of $180,000 from Rogan
Tech Co. Later that same week, **HAO GLOBAL** received a wire transfer of $6,240,000 from
Thailand Company-1.

On February 18, 2025, **HSU** made a payment of $5,718,000 to Global Technology
Company-1 and arranged for 30 Nvidia H200 baseboards to be picked up at Global Technology
Company-1 in North Carolina. Early the next day, **HSU** contacted a logistics company to arrange
for the shipment of GPUs. **HSU** then made an additional payment of $381,200 to Global
Technology Company-1 and added an additional two baseboards to the order, bringing the total to
32 H200 baseboards. **HSU** also arranged for the future purchase of an additional 58 Nvidia H200
baseboards to be picked up from Global Technology Company-1 at an undetermined date. **HSU**
also provided a completed shipper's letter of instruction to the logistics company, in which he
provided no consignee contact information, no ECCN information, and an incorrect description of
commodities.

On February 21, 2025, the shipment of 32 H200 GPU baseboards was picked up from Global Technology Company-1 and transported to a logistics company warehouse in Atlanta, Georgia. On the same day, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 32 H200 GPU baseboards at a price of $190,600 each for a total of $6,099,200.

On February 24, 2025, agents from the U.S. Department of Commerce, Bureau of Industry and Security, detained the shipment of GPU baseboards in Atlanta based on the incorrect and misclassified shipping information.

### GPU TRANSACTION #2 (PART 2)

On February 20, 2025, Chinese Company-2 wired $2,880,000 to Thailand Company-1. On February 24, 2025, Thailand Company-1 wired $6,240,000 to **HAO GLOBAL**. That same day, **HSU** arranged for the 58 Nvidia H200 GPU baseboards to be picked up from Global Technology Company-1 in Whitsett, North Carolina.

On February 25, 2025, **HSU** made a payment of $11,054,800 from **HAO GLOBAL** to Global Technology Company-1. On that same day, Chinese Company-2 wire transferred $6,720,000 to Thailand Company-1. On February 26, 2025, Thailand Company-1 wire transferred $6,240,000 to **HAO GLOBAL**. On February 27, 2025, Global Technology Company-1 notified **HSU** that the 58 Nvidia H200 GPU baseboards were available for pick up in Whitsett, North Carolina.

On February 27, 2025, **HSU** wire transferred $450,000 from **HAO GLOBAL** to the Hong Kong-based bank account of Yu Fan Electronics Co. Limited for a "March 2025 Consulting Fee." That same day, **HSU** wire transferred an additional $450,000 from **HAO GLOBAL** the Hong

Kong-based bank account of Yu Fan Electronics Co. Limited for a "February 2025 Consulting Fee."

On February 28, 2025, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 58 H200 GPU baseboards at a price of $190,600 each for a total of $11,054,800. The invoice warned that the GPU baseboards were export-controlled by the U.S. Government and authorized only to the country of ultimate destination herein identified. The "Ship To" address was a retail-style strip center in Houston, Texas. The "Invoice To" address provided was a vacant office suite in in Sugar Land, Texas.

On March 3, 2025, **HSU** wire transferred an additional $450,000 from **HAO GLOBAL** to the Hong Kong-based bank account of Yu Fan Electronics Co. Limited for a "January 2025 Consulting Fee."

On March 4, 2024, Global Technology Company-1 inquired about the timeline for **HSU's** collection of the GPU baseboards. In response, **HSU** notified Global Technology Company-1 that the delay in pickup was the result of the freight forwarder encountering unexpected issues with the previous shipment of 32 GPU baseboards, and they were still working on finding a new freight forwarder. On March 6, 2025, **HSU** arranged for Chinese Freight Forwarder-1, a China-based global logistics company, to collect the 58 GPU baseboards from Global Technology Company-1 in Whitsett, North Carolina.

On March 10, 2025, the shipment of 58 H200 GPU baseboards were picked up at Global Technology Company-1 in Whitsett, North Carolina, and transported to a warehouse in New Jersey, owned by a logistics business that only interacts with China-based customers and brokers.

The bill of lading for the transportation, which was forwarded to **HSU**, misclassified the "Item Description" as "ADAPTER MODULE / ADAPTER CARD" with a weight of 1,414 pounds.

On March 14, 2025, a shipment of items described as ADAPTER MODULE with a weight of approximately 1,400 pounds was exported from Canada to Hong Kong, China. The exporter was listed as Chinese Company-2.

**GPU TRANSACTION #3**

On February 23, 2025, Global Technology Company-1 forwarded **HSU** an agreed purchase order for 195 Nvidia H200 Tensor Core GPU baseboards with a total purchase price $36,075,000.

On February 24, 2025, Chinese Company-2 made two wire transfers from a Hong Kong-based bank account, $5,000,000 and $5,800,000, to Taiwan Company-1, a Taiwan-based GPU Server business. That same day, **HAO GLOBAL** received a wire transfer of $6,815,982 from Taiwan Company-1. On February 25, 2025, **HAO GLOBAL** received an additional wire transfer of $3,833,982 from Taiwan Company-1.

On February 26, 2025, Chinese Company-2 made two wire transfers from a Hong Kong-based bank account, $8,420,000 and $7,780,000, to Taiwan Company-1. Later that same day, **HAO GLOBAL** received a wire transfer of $6,815,982 from Taiwan Company-1. On February 27, 2025, **HAO GLOBAL** received a wire transfer of $9,158,982 from Taiwan Company-1. On that same day, **HSU** made a payment of $500,000 from **HAO GLOBAL**'s account to Global Technology Company-1.

On March 12, 2025, **HSU** and Global Technology Company-1 agreed to break the purchase into multiple transactions, the first of which was for 104 H200 GPU baseboards. On March 13, 2025, Global Technology Company-1 forwarded an invoice to **HSU** for the purchase of 104 H200

GPU baseboards at a price of $185,000 each for a total of $19,240,000. The invoice warned that the GPU baseboards were export-controlled by the U.S. Government and authorized only to the country of ultimate destination herein identified. The "Ship To" address was a retail-style strip center in Houston, Texas. The "Invoice To" address provided was a vacant office suite in in Sugar Land, Texas.

On or about March 14, 2025, the shipment of 104 H200 GPU baseboards was picked up at Global Technology Company-1 in Whitsett, North Carolina, and transported to a warehouse in New York, which deals primarily with China-based customers and brokers. The freight forwarder that transported the shipment was Chinese Freight Forwarder-1. The bill of lading for the transportation, which was forwarded to **HSU**, misclassified the "Item Description" as "ADAPTER MODULE / ADAPTER CARD" with a weight of 2,522 kilograms. On or about March 15, 2025, the shipment of 104 H200 GPUs arrived in New York. The Government has reason to believe and evidence to support that the shipment, similar to the March 14, 2025 shipment, was exported from Canada to Hong Kong by Chinese Company-2.

On or about March 19, 2025, **HSU** transferred $621,500 from the **HAO GLOBAL** account to Great Disposal Limited, a Hong Kong-based subsidiary of Yu Fan Electronics Co. Limited, for a "Consulting Fee." On or about March 24, 2025, **HSU** wire transferred $728,500 from the **HAO GLOBAL** account to Great Disposal Limited for a "Consulting Fee."

Therefore, HAO GLOBAL, through its corporate representative, **ALAN HAO HSU**, admits and confesses that in or about and between October 2024 and May 2025, in the Southern District of Texas and elsewhere, it received, concealed, bought, sold, and facilitated the transportation, concealment, and sale of Nvidia H100 and H200 Graphics Processing Units prior

16

to exportation to Thailand and Taiwan, knowing them to be intended for exportation, and knowingly causing the submission of false and misleading export information through Shipper's Export Declarations and the Automated Export System.

### Breach of Plea Agreement

13. If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this plea agreement, including required financial information, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against Defendant in any prosecution.

### Monetary Penalties, Assets, and Financial Disclosures

14. Defendant understands and agrees that monetary penalties will be subject to immediate enforcement as provided in 18 U.S.C. § 3613 and that monetary penalties will be submitted to the Treasury Offset Program so that payments to Defendant may be applied to federal debts.

15. Defendant understands that restitution, forfeiture, and fines are separate components of sentencing and are separate obligations. Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines. Subject to the provisions of paragraph 4 above, Defendant waives the right to challenge

in any manner, including by direct appeal or in a collateral proceeding, any restitution order, any forfeiture orders, and any fines.

## Forfeiture

16.   As part of this plea agreement, Defendant agrees to the following:

(a) to forfeit, via either an administrative or judicial proceeding, all assets listed in the charging document (including any Supplemental Notice of Forfeiture), and to forfeit or abandon any assets seized during this investigation or a related investigation;

(b) to withdraw any claims and petitions for such listed or seized assets, whether in this proceeding or another proceeding, and to waive notice of administrative proceedings (including forfeiture, destruction, and abandonment for seized property);

(c) that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists, so that the forfeiture money judgment may be immediately satisfied via forfeiture of substitute property; and

## Financial Statement

17.   Defendant agrees to truthfully complete under penalty of perjury, within thirty days of the execution of this Plea Agreement, a financial statement on a form provided by the United States Attorney's Office and to update the statement within seven days of any material change. Defendant also agrees to make full disclosure to the United States Probation Office of all current and anticipated assets in which Defendant has an interest both before sentencing and again before termination of supervised release or probation, with such disclosures to be shared with the United States Attorney's Office.

18.   Defendant further agrees not to dispose or transfer any assets without the prior written permission of the United States and to authorize the release of all financial information requested by the United States, including, but not limited to, credit histories and tax returns. Defendant agrees

to discuss and answer any questions by the United States relating to Defendant's financial disclosure, including in a deposition or informal debtor exam, whether before or after sentencing.

## Complete Agreement

19. This written plea agreement, consisting of 22 pages, including the attached addendum of Defendant and its attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel. Other than any written proffer agreement(s) that may have been entered into between the United States and Defendant, this agreement supersedes any prior understandings, promises, agreements, or conditions between the United States and Defendant. No additional understandings, promises, agreements, or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless in writing and signed by all parties. Defendant acknowledges that no threats have been made against it and that it is pleading guilty freely and voluntarily because it is guilty.

20. Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _____ Houston _____, Texas, on _____ October 10 _____, 2025.

_____
Alan Hao Hsu
Corporate Representative
Defendant Hao Global, LLC

Subscribed and sworn to before me on _____ October 10 _____, 2025.

NATHAN KYLE OCHSNER
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

19

APPROVED:

**NICHOLAS J. GANJEI**
United States Attorney

By: _____

John Marck
Assistant United States Attorney
Southern District of Texas
United States Attorney's Office

Jeffery Vaden
Attorney for Defendant

By: _____

S. Mark McIntyre
Assistant United States Attorney
Southern District of Texas
United States Attorney's Office

**JOHN A. EISENBERG**
Assistant Attorney General
National Security Division

By: _____

Fatema Merchant
Yifei Zheng
Trial Attorney
National Security Division
U.S. Department of Justice

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 4:25-cr-00510** |
| | § | |
| **HAO GLOBAL LLC** | § | |
| | § | **FILED UNDER SEAL** |
| | § | |

## PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant its rights with respect to the pending Information. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory, and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. I have also explained to Defendant that sentences on multiple counts may be imposed to run consecutively to one another or to any other sentence. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.


_____          _____10/10/2025_____
Jeffery Vaden                         Date
Attorney for Defendant


I have consulted with my attorneys and fully understand all my rights with respect to the Information pending against me. My attorneys have fully explained, and I understand, all my rights

21

with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorneys, I understand this agreement, and I voluntarily agree to its terms.

_____          _____10/10/2025_____
Alan Hao Hsu                                     Date
Corporate Representative
Defendant Hao Global, LLC